UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SCOTT LEONARD, JULIAN LYONS, MATTHEW MACKWOOD, MILES MAUESBY, and ROBERT PIETRAS, individually and on behalf of all others similarly situated, | CASE NO. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | JURY TRIAL DEMANDED |
| v. | |
| HUEL, INC., | |
| Defendant. | |

Plaintiffs Scott Leonard, Julian Lyons, Matthew Mackwood, Miles Mauesby, and Robert Pietras (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action suit for damages and equitable relief against Huel, Inc. ("Huel" or "Defendant"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, and the investigation of their counsel, and on information and belief as to all other allegations:

## SUMMARY OF THE ACTION

1.    Plaintiffs bring this class action against Huel for its unfair and deceptive business practice of marketing and selling certain protein powder products that contain or risk containing significant levels of heavy metals, specifically, lead and cadmium, despite affirmatively misrepresenting otherwise. The products at issue are Defendant's Huel Black Edition protein powder and Ready-to-Drink shakes (the "Products").

2.      To date, Defendant affirmatively informs its consumers that "[w]e carry out independent third party testing of our ingredients, such as routine testing for microbials, allergens, and *heavy metals*."[1] (emphasis added).

3.      In a section dedicated to the testing of heavy metals, Defendant currently claims: "The heavy metals include arsenic, cadmium, lead, and mercury. We routinely test our products to ensure that they meet the strict heavy metal regulations set by both the FDA (Food and Drug Administration) and the EFSA (European Food Safety Authority). However, the levels in Huel are well below the limits set by health authorities and pose no risk to consumers."[2]

4.      Even prior to the recent reports of high lead and cadmium levels in the Products, Huel affirmatively misrepresented the quality controls it provided. For example, a version of its website dated April 20, 2024, stated:

a.      "Testing: we carry out independent testing of our ingredients."[3]

b.      "The heavy metals include arsenic, cadmium, lead, and mercury. The long-term ingestion of heavy metals has been shown to have harmful effects…We periodically test products to identify heavy metal levels and to measure them against the recommended intake levels. We also visit our suppliers so that we can

---

[1] https://huel.com/pages/food-safety-and-quality-controls (last accessed Dec. 4, 2025).
[2] https://huel.com/pages/food-safety-and-quality-controls (last accessed Dec. 4, 2025).
[3]      https://web.archive.org/web/20240420235048/https://huel.com/pages/huel-food-safety-and-quality-controls (last accessed Dec. 4, 2025); *see also* a version of the webpage from September 28, 2023, https://web.archive.org/web/20230928085010/https://huel.com/pages/huel-food-safety-and-quality-controls (same).

understand where our ingredients come from as part of our procurement procedure."[4]

5.      Defendant maintains that the "safety and quality of our products are our priority."[5]

6.      Defendant further lauded its Products as "No nonsense," containing "173 health benefits," in a "[c]omplete high-protein powder meal," all while concealing or failing to mention the astronomically high levels of lead and cadmium each unit contained compared to other protein powders on the market.

7.      As discussed in detail below, Consumer Reports' testing confirmed that merely one serving of the Products contained 6.3 micrograms of lead, or about 1,290% of Consumer Reports' recommended daily lead limit. Such heavy metals, even in much smaller doses, have been deemed "dangerous to human health," leading to a range of health issues from low energy levels to damage to the functioning of the brain, lungs, kidneys, liver, blood composition, and other important organs.

8.      Defendant manufactures, markets, and distributes a range of dietary supplements, snacks, and meals, which it markets as "Nutritionally Complete Meals Without Compromise."[6]

9.      Plaintiffs are some of the many nationwide consumers of Huel's Products. They purchased and/or used the Products and were therefore exposed to, or risked being exposed to, significant levels of lead and cadmium.

---

[4]      https://web.archive.org/web/20240420235048/https://huel.com/pages/huel-food-safety-and-quality-controls (last accessed Dec. 4, 2025); *see also* a version of the webpage from September 28, 2023, https://web.archive.org/web/20230928085010/https://huel.com/pages/huel-food-safety-and-quality-controls (same).
[5]  https://huel.com/pages/food-safety-and-quality-controls (last accessed Dec. 4, 2025).
[6]  https://huel.com/collections/complete-nutrition (last accessed Nov. 23, 2025).

10.     The heavy metals are entirely avoidable byproducts of Defendant's ingredient selection and manufacturing process and should not have ended up in the Products.

11.     Defendant is therefore liable to Plaintiffs and all members of the class members defined below ("Class Members") for selling, advertising, manufacturing, and distributing the Products with affirmative misrepresentations and without disclosing that the Products contain or risk containing significant levels of these toxic heavy metals.

## PARTIES

### A.     Plaintiff

12.     Plaintiff Scott Leonard is a resident and citizen of California, residing in Los Angeles, California.

13.     Plaintiff Julian Lyons is a resident and citizen of Florida, residing in Bradenton, Florida.

14.     Plaintiff Matthew Mackwood is a resident of New Hampshire, residing in Canaan, New Hampshire.

15.     Plaintiff Miles Mauesby is a resident and citizen of Connecticut, residing in Hamden, Connecticut.

16.     Plaintiff Robert Pietras is a resident and citizen of Florida, residing in Daytona Beach, Florida.

### B.     Defendant

17.     Defendant Huel, Inc. is a Delaware corporation with its principal place of business located at 45 Main Street, Brooklyn, NY 11201. Defendant sells, manufactures, and distributes the Products, among others.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of Class Members is estimated to be over many thousands, several of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

19.     This Court has personal jurisdiction because Defendant's headquarters and principal place of business are in this District.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because it is the District within which Defendant has the most significant contacts.

## FACTUAL BACKGROUND

### A.     Huel's Manufacturing, Selling, and Advertising of the Products

21.     Protein powders are nutritional supplements. Buyers of protein supplements consume them regularly, often daily. The Products are promoted as premium-quality high-protein supplements that provide a "complete meal,"[7] providing "serious nutrition without the hassle."

22.     Defendant is a large and continually growing protein supplement brand in the United States.[8] On information and belief, sales of the Products nationwide total tens of millions per year.[9]

23.     Defendant prides itself on being a healthy and health-conscious brand. According to its website, "[a] team of experienced Nutritionists and Product Development Specialists

---

[7] https://huel.com/products/huel-black-edition (last accessed Nov. 24, 2025).
[8]     https://www.business-live.co.uk/retail-consumer/huels-profits-triple-hitting-214m-30394354 (last accessed Nov. 24, 2025) (Huel's U.S. revenue increased by 16% from 2023 to 2024).
[9] *Id*.

develops all Huel products."[10] "This means every Huel meal contains a balance of all 27 essential vitamins and minerals, protein, essential fats, carbs, fiber, and phytonutrients in a single product."[11] Huel's mission is "[t]o make nutritionally complete, convenient, affordable food, with minimal impact on animals and the environment."[12]

24.    Huel states that consumers "need food that prioritizes nutrition, does not generate lots of waste, and has minimal environmental impact. But we also need it to be convenient and affordable. We believe Huel can be a solution to this problem."[13] "Huel is low in sugar and lactose-free (in fact, it has zero animal products). It contains no GMOs, and it is affordable."[14]

25.    Huel's website repeatedly touts its high quality and premium nature, which it claims to maintain through the "strictest quality standards" and "highest safety standards."[15]

26.    Indeed, Defendant contends that "[a]ll Huel products… are produced using the best ingredients in facilities that meet the strictest quality standards. All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition."[16]

27.    And Huel's website claims that its products are extensively tested. In a section discussing its "quality [and] testing," Huel states that "[w]e've spent over a decade in pursuit of creating a high–quality Foundational Nutritional supplements. We think about quality through

---

[10] https://huel.com/pages/about-us (last accessed Nov. 23, 2025).
[11] *Id*.
[12] *Id*.
[13] *Id*.
[14] *Id*.
[15] *Id*.
[16] *Id*.

three considerations. And at each step of the process, we go above and beyond industry standards."[17]

28.    Defendant affirms that: "We conduct quality checks in our dedicated quality lab. Raw materials are tested by our specialized raw material team for key parameters, including particle size, moisture content, water activity, and organoleptic properties. This rigorous process ensures tightly controlled product quality and industry-leading consistency for our customers."[18]

29.    Indeed, in addition to Huel's overall brand positioning, the following statements taken individually and/or collectively led reasonable consumers to believe that the Products are appropriate for regular use, do not increase negative health risks associated with heavy metals if consumed regularly, and do not contain or risk containing detectable, significant, or unsafe levels of heavy metals.

   a.    To date, Defendant affirmatively informs its consumers that "[w]e carry out independent third party testing of our ingredients, such as routine testing for microbials, allergens, and *heavy metals*."[19] (emphasis added).

   b.    In a section dedicated to the testing of heavy metals, Defendant still claims: "The heavy metals include arsenic, cadmium, lead, and mercury. We routinely test our products to ensure that they meet the strict heavy metal regulations set by both the FDA (Food and Drug Administration) and the EFSA (European Food Safety Authority). *However, the levels in Huel are below the limits set by health authorities and pose no risk to consumers*."[20] (emphasis added).

---

[17] https://huel.com/pages/quality-standards (last accessed Nov. 23, 2025).
[18] *Id*.; *see also* https://huel.com/pages/why-huel (last accessed Nov. 26, 2025).
[19] https://huel.com/pages/food-safety-and-quality-controls (last accessed Dec. 4, 2025).
[20] https://huel.com/pages/food-safety-and-quality-controls (last accessed Dec. 4, 2025).

    c.   Even prior to the recent reports of high lead and cadmium levels in the Products, Huel affirmatively misrepresented the quality controls it provided. For example, a version of its website dated April 20, 2024, stated:

        i.   "Testing: we carry out independent testing of our ingredients."[21]

        ii.   "The heavy metals include arsenic, cadmium, lead, and mercury. The long-term ingestion of heavy metals has been shown to have harmful effects…We periodically test products to identify heavy metal levels and to measure them against the recommended intake levels. We also visit our suppliers so that we can understand where our ingredients come from as part of our procurement procedure."[22]

    d.   Defendant maintains that the "safety and quality of our products are our priority."[23]

30.    Based on these affirmative representations, Defendant's Products should not have contained (or risked containing) detectable levels of heavy metals, let alone significant levels or unsafe levels.

---

[21]   https://web.archive.org/web/20240420235048/https://huel.com/pages/huel-food-safety-and-quality-controls (last accessed Dec. 4, 2025); *see also* a version of the webpage from September 28, 2023, https://web.archive.org/web/20230928085010/https://huel.com/pages/huel-food-safety-and-quality-controls (same).

[22]   https://web.archive.org/web/20240420235048/https://huel.com/pages/huel-food-safety-and-quality-controls (last accessed Dec. 4, 2025); *see also* a version of the webpage from September 28, 2023, https://web.archive.org/web/20230928085010/https://huel.com/pages/huel-food-safety-and-quality-controls (same).

[23] https://huel.com/pages/food-safety-and-quality-controls (last accessed Dec. 4, 2025).

31.     As explained above, Defendant positions itself and its brand as trustworthy, safe, and responsible to consumers, and the Products themselves as premium, specialty food items. Defendant's advertising and labeling are designed to reinforce this message.

32.     The Products come with a packaging insert, providing consumers with additional claims that include: "Improving *the health of people*," and "In choosing [Huel] you're joining millions of Hueligans across 100 countries, all making *a positive change to their lifestyle*[.]" (emphasis added).

33.     When ordering one of the Products from Huel.com or a third-party retailer, the products contain additional descriptions such as "Only the essentials, no unexpected extras," "A formula you can trust," "Developed by expert nutritionists," "Third-party tested," and "Backed by science."[24]

34.     Exemplars of the Products' packaging and advertising (collected from publicly available sources) are shown below.

---

[24]  *See  e.g.*,   https://chewnchill.com/products/huel-black-edition-nutritionally-complete-high-protein-complete-meal-chocolate (last accessed Nov. 26, 2025).



https://images.ctfassets.net/z5siblnwi90s/1n5WG2oT0OxAJYijclIqvL/c3fb788f88b96f7cb8341

993c4ab42c9/05-Science_cred__NEWV2.jpg?fm=png&w=3500&q=60



https://m.media-amazon.com/images/I/71PlFBMVN6L._AC_UF350,350_QL80_.jpg



https://m.media-amazon.com/images/I/81Voza3kSGL._AC_UF350,350_QL80_.jpg



https://www.instagram.com/reel/CwnW28dtW1Q/

35.     The above representations on labeling and in advertising, taken individually or collectively, led reasonable consumers to believe that the Products (1) had been tested by third parties and met the standards for human consumption, (2) did not contain or risk containing high levels of heavy metals, and (3) could not materially increase negative health risks associated with heavy metals exposure if consumed regularly, including while pregnant.

B.     **The Consumer Reports' Investigation**

36.     Consumer Reports is "an independent, nonprofit member organization that works side by side with consumers for truth, transparency, and fairness in the marketplace."[25]

37.     Consumer Reports recently tested the Products, among many other protein powders in the market, for heavy metals. The findings were published on October 14, 2025.[26]

38.     Specifically, Consumer Reports tested at least two unique samples of Huel Black Edition Protein Chocolate, along with 22 other protein powders manufactured by other companies.[27] The tested products were "purchased between November 2024 and January 2025 from supermarkets and health food stores in New York, as well as from online retailers."[28]

39.     "The samples were transferred into brown polyethylene jars, blind coded to preserve their identities, and shipped to an independent, accredited laboratory. At the laboratory, sample preparation or mixing was performed in fume hoods known to be free of contamination from trace metals. Water, sample containers, and other materials used for the analyses were monitored for contamination to account for any biases in sample results."[29] "Testing for total

---

[25] https://www.consumerreports.org/about-us/what-we-do/ (last accessed Nov. 24, 2025).

[26] Protein Powders and Shakes Contain High Levels of Lead, *Consumer Reports*, Oct. 14, 2025, https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed Nov. 23, 2025).

[27] Test Methodology: Heavy Metals in Protein Supplements, *Consumer Reports* at 3-4, https://article.images.consumerreports.org/image/upload/v1761140939/prod/content/dam/CRO-Images-2025/Special%20Projects/Consumer-Reports-Protein-Powders-and-Shakes-Contain-High-Levels-of-Lead-Methodology-Test-Results-v2.pdf, (last accessed Nov. 23, 2025).

[28] *Id*. at 1.

[29] *Id*.

protein was conducted using the Dumas Method.[30] All samples were prepared and analyzed in accordance with the Association of Official Analytical Chemists Method 968.06."[31]

40.    The results of Consumer Reports' testing showed that, on average, the Products contained 6.3 micrograms of lead (70.2 parts per billion) and 9.21 micrograms of cadmium (102 parts per billion) per serving.[32] As detailed by Consumer Reports and below, these levels are much higher than the levels in other protein powders and present serious health risks to consumers of the Products.

41.    These results are hardly "*well below* the limits set by health authorities" and cannot be said to "pose no risk to consumers."[33] (emphasis added).

---

[30] The Dumas Method uses high-temperature combustion to determine the protein content of foodstuffs. The method "involves convert[ing] nitrogen present in a sample into gaseous NOx by complete combustion in a furnace maintained at 950 - 1.100 °C. The final product (NOx) is then reduced to N2 and measured using the thermal conductivity detector." Dumas and Kjeldahl Method Comparison Protein Determination in Feed, *Velp Scientifica*, available at: https://www.velp.com/public/file/E-book-DumasandKjeldahlMethodComparison-NProteinDetermination-274578.pdf?srsltid=AfmBOooaqWXugFJopaQGHsQGb3MBlJ4cHOYxIonAHR_HUl-_Nthf92wD

[31] *Id*.; The Official Analytical Chemists Method 968.06 is an established nitrogen conversion factor for crude protein. House, J. et al., Determination of the protein quality of almonds (Prunus dulcis L.) as assessed by in vitro and in vivo methodologies, *Food Science & Nutrition*, July 29, 2019, available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC6766546/

[32] *Id*. at 3.

[33] https://huel.com/pages/food-safety-and-quality-controls (last accessed Dec. 4, 2025); *see also* Sec. D, *infra*; In 2022, "the FDA [updated] its interim reference levels (IRLs) for lead from food to 2.2 [micrograms]/day for children and 8.8 [micrograms]/day for females of childbearing age." Flannery, B. and Middleton, K., Updated interim reference levels for dietary lead to support FDA's Closer to Zero action plan, *Regulatory Toxicology and Pharmacology*, (June 8, 2022), available at: https://pubmed.ncbi.nlm.nih.gov/35690180/#:~:text=The%20FDA%20is%20updating%20its%20interim%20reference,implementing%20its%20Closer%20to%20Zero%20action%20plan.

C.    **The Severe Risks Associated With Lead and Cadmium Exposure**

42.    Heavy metals accumulate in the body, particularly the kidneys and other organs.[34] This means the body cannot excrete and expel toxins as quickly as they are absorbed, so the amount present in the body and the accompanying negative health risks grow over time.[35]

43.    The U.S. Food and Drug Administration ("FDA") and World Health Organization ("WHO") have declared heavy metals "dangerous to human health."[36]

44.    For example, "[e]ven small doses of lead exposure are hazardous, particularly to children. Lead is associated with a range of bad health outcomes, including behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth."[37]

45.    Heavy metals also pose health risks to adults. "Heavy metal toxicity can lower energy levels and damage the functioning of the brain, lungs, kidneys, liver, blood composition and other important organs."[38]

46.    These wide-ranging health risks underscore the importance of limiting heavy metal exposure and consumption. It is particularly important to limit or eliminate heavy metals from household products that can be used and ingested daily, like protein powders.

---

[34] Jesse Hirsch, Heavy Metals in Baby Food: What You Need to Know, *Consumer Reports* (June 27, 2023), available at https://www.consumerreports.org/health/food-safety/heavy-metals-in-baby-food-a6772370847/.

[35] *Id.*

[36] Staff Report: Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury, U.S. House of Representatives Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Feb. 4, 2021 ("House Report") at 2, available at https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf

[37] *Id.* at 11.

[38] Jaishankar, M. et al., Toxicity, mechanism and health effects of some heavy metals, *Interdisciplinary Toxicology*, (Nov. 15, 2014), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4427717/#:~:text=In%20small%20amounts%20they%20are,composition%20and%20other%20important%20organs.

**Lead Exposure**

47.    Several governmental agencies have determined that lead is a probable human carcinogen.[39] Exposure to or consumption of even small amounts of lead can also lead to other health issues, including high blood pressure, reproductive issues, nerve disorders, memory problems, and muscle and joint pain.[40]

48.    Lead in children can cause "anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs,"[41] and "can lead to brain and nervous system damage, learning disabilities, behavioral problems, and developmental delays."[42] In adults, it can lead to "kidney damage, cardiovascular problems, reproductive damage, and brain damage[.]"[43]

49.    No amount of lead is safe for human exposure or consumption. Indeed, according to the FDA, WHO, and Centers for Disease Control ("CDC"), there is no "safe" level of lead that should be in human blood.[44]

---

[39] Centers for Disease Control, Agency for Toxic Substances and Disease Registry, available at https://wwwn.cdc.gov/Tsp/ToxFAQs/ToxFAQsDetails.aspx?faqid=93&toxid=22#:~:text=Top%20of%20Page-,Can%20lead%20cause%20cancer?,will%20cause%20cancer%20in%20humans.

[40] What are some of the health effects of lead? United States Environmental Protection Agency, available at https://www.epa.gov/lead/what-are-some-health-effects-lead

[41] Lead Poisoning, World Health Organization (Sep. 27, 2024), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health

[42] Karen Feldscher, Synthetic Braiding Hair Used by Black Women Contain Dangerous Chemicals, Harvard T.H. Chan School of Public Health (Mar. 5, 2025), available at https://hsph.harvard.edu/news/synthetic-braiding-hair-used-by-black-women-contain-dangerous-chemicals/

[43] *Id.*

[44] Jessica Pupovac, Lead Levels Below EPA Limits Can Still Impact Your Health, *NPR* (Aug. 13, 2016), available at https://www.npr.org/sections/thetwoway/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health ("No amount of lead is known to be safe."); Lead in Food and Foodwares, FDA, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (last updated Jan. 6, 2025); About Childhood Lead

50.    According to the CDC, "[t]esting products in a laboratory is the only way to tell for certain if the product contains lead. It is best to avoid the use of products that may contain lead."[45]

51.    "Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time."[46]

52.    Of note, "[r]epeated low-level exposure [to lead] over a prolonged period" can result in "chronic poisoning" and adverse symptoms including "persistent vomiting, encephalopathy, lethargy, delirium, and coma."[47] This has occurred when blood lead levels reach 40 to 60 micrograms per deciliter ("μg/dl").[48] Moreover, "Elevated levels of lead exposure have been consistently associated with a range of kidney abnormalities, even when lead concentrations are relatively modest, such as around 10 μg/dl."[49]

53.    As previously explained, bodily exposure to lead builds up over time. Buildup has been clinically shown to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, in addition to serious injuries to the nervous system, organs, and body

---

Poisoning Prevention, Centers for Disease Control and Prevention (Mar. 13, 2025), available at https://www.cdc.gov/lead-prevention/about/index.html ("There are no safe levels of lead in the blood.").

[45] About Lead in Foods, Cosmetics, and Medicines, Centers for Disease Control and Prevention (Sep. 24, 2024), https://www.cdc.gov/lead-prevention/prevention/foods-cosmetics-medicines.html

[46] Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury, U.S. House of Representatives, (Feb. 4, 2021), available at: https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf at 49

[47] Bhasin, T. et al., Unveiling the Health Ramifications of Lead Poisoning: A Narrative Review, *Cureus*, (Oct. 9, 2023), available at https://www.cureus.com/articles/184381-unveiling-the-healthramifications-of-lead-poisoning-a-narrative-review#!/.

[48] *Id*.

[49] *Id*.

systems. In short, lead is extremely toxic even at low levels, and especially so over an extended

time. So, lead exposure should be avoided.

**Cadmium Exposure**

54.    "[A]ny cadmium exposure should be avoided."[50] Exposure to even low levels of

cadmium over time may build up cadmium in the kidneys and cause kidney failure and bone

loss.[51]

55.    Cadmium exposure can affect the gastrointestinal system, as well as lead to

hemorrhagic gastroenteritis, liver and kidney necrosis, cardiomyopathy, and metabolic

acidosis.[52]

56.    Exposure to cadmium is also linked to cardiovascular disease and cancer.[53]

57.    Scientists have reported a "tripling of risk for learning disabilities and special

education among children with higher cadmium exposures, at exposure levels common among

U.S. children."[54]

---

[50] M. Nathaniel Mead, Cadmium Confusion: Do Consumers Need Protection?, *Environmental Health Perspectives*, Dec. 2010, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/

[51] *Id.*

[52] Cadmium Toxicity: What Health Effects are Associated with Acute High-Dose Cadmium Exposure? Agency for Toxic Substances and Disease Registry, available at https://archive.cdc.gov/www_atsdr_cdc_gov/csem/cadmium/docs/cadmium.pdf

[53] M. Nathaniel Mead, Cadmium Confusion: Do Consumers Need Protection?, *Environmental Health Perspectives*, Dec. 2010, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/

[54] Is Homemade Baby Food Better? A New Investigation: Tests Compare Toxic Heavy Metal Contamination in Homemade Versus Store-Bought Foods for Babies, Healthy Babies Bright Futures, Aug. 2022, at 69 ("Healthy Babies Bright Futures Report"), available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://hbbf.org/sites/default/files/2022-12/BabyFoodReport_ENGLISH_R6_0.pdf

58.     Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[55] The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[56]

59.     Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequester[s] in [human] tissue."[57]

### D.     The Products Contain Significant Levels of Lead and Cadmium

60.     According to the U.S. Environmental Protection Agency ("EPA"), Maximum Contaminant Level Goals ("MCLG") are "non-enforceable health goals" based on "possible health risks."[58] The EPA also sets "an enforceable regulation called a maximum contaminant level (MCL) based on the MCLG. MCLs are set as close to the MCLGs as possible, considering cost, benefits and the ability of public water systems to detect and remove contaminants using suitable treatment technologies."[59]

61.     For drinking water, the EPA set the MCLG for lead at zero, and the action at 0.015 mg/L (equivalent to 0.01 parts per million or 10 parts per billion).[60] The "EPA has set this level

---

[55] Id.

[56] Public Health Statement for Cadmium, Agency for Toxic Substances and Disease Registry, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15

[57] Genius, S.J., et al., Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations, PLOS ONE, Nov. 21, 2012, available at https://doi.org/10.1371/journal.pone.0049676

[58] Basic Information about Lead in Drinking Water, U.S. Environmental Protection Agency, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water

[59] Id.

[60] In lieu of a formal MCL for lead, the EPA established a "Treatment Technique" action level. See https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water; https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations

based on the best available science which shows there is no safe level of exposure to lead. The fact that there is no safe level of exposure underscores the fact that any action to reduce exposures can have impacts on lives and livelihoods."[61]

62.     The FDA has set "interim reference levels" designed to protect against lead toxicity for children and women of childbearing age. Those levels for lead are currently 2.2 micrograms and 8.8 micrograms per day, respectively.[62] An FDA spokesperson told Consumer Reports that "there is sufficient evidence that the 8.8 micrograms per day benchmark should be applied to all adults."[63]

63.     California's Proposition 65 "Proposition 65 requires businesses to provide warnings to Californians about significant exposures to chemicals that cause cancer, birth defects or other reproductive harm."[64]

64.     To that end, Proposition 65 provides safe harbor levels of certain chemicals contained in food and liquids. "Safe harbor levels, which include No Significant Risk Levels (NSRLs) for cancer-causing chemicals and Maximum Allowable Dose Levels (MADLs) for chemicals causing reproductive toxicity, have been established for many of the chemicals listed under Proposition 65. Exposure levels and discharges to drinking water sources that are below the safe harbor levels are exempt from the requirements of Proposition 65."[65]

---

[61] https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water

[62] https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-highlevels-of-lead-a4206364640/%20

[63] https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-highlevels-of-lead-a4206364640/%20 *https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-highlevels-of-lead-a4206364640/%20* Id.

[64] http://oehha.ca.gov/proposition-65/about-proposition-65 (last accessed Nov. 24, 2025).

[65] https://oehha.ca.gov/proposition-65/general-info/proposition-65-no-significant-risk-levels-nsrls-and-maximum-allowable-dose-levels-madls (last accessed Nov. 24, 2025).

65.     Proposition 65 sets the safe harbor level for lead to prevent reproductive harm at 0.5 micrograms per day.[66]

66.     Just one serving of the Products contained 6.3 micrograms of lead, or about 1,290% of Consumer Reports' recommended daily lead limit and 1,260% Proposition 65 safe harbor limit.[67]

67.     To put this into perspective, the "average American adult is exposed to up to 5.3 micrograms of lead each day through their diet, according to a 2019 analysis published by scientists at the FDA."[68] "That means someone taking a single serving of one of these supplements daily is likely exceeding the FDA's interim reference level for dietary lead."[69]

68.     In addition, one serving of the Products also "contained 9.2 micrograms of cadmium, more than double the level that public health authorities and CR's experts say may be harmful to have daily, which is 4.1 micrograms."[70]

69.     Consumer Reports thus lists Defendant's Products as one of the "Products to Avoid."[71]

E.      **Protein Powders Can and Are Produced Without Detectable Levels of Lead and Cadmium**

70.     Protein powder supplements can be and are manufactured without detectable levels of lead and cadmium in finished products.

---

[66] *Id.*
[67] Protein Powders and Shakes Contain High Levels of Lead, *Consumer Reports*, Oct. 14, 2025, https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed Nov. 23, 2025).
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*

71.     For example, according to Consumer Reports' investigation, MuscleTech 100% Mass Gainer Vanilla Milkshake did not contain detectable levels of lead.[72]

72.     Similarly, MuscleTech 100% Mass Gainer Vanilla Milkshake, Optimum Nutrition Serious Mass Vanilla, and Transparent Labs Mass Gainer Sweet Vanilla each did not contain detectible levels of cadmium.[73]

73.     Consumer Reports' results showed that there are many other protein powder supplements in the marketplace with far lower levels of lead and cadmium than the Products.[74]

F.      **Reasonable Consumers Would Consider The Presence of Toxic Heavy Metals In Protein Powders To Be Material**

74.     Any reasonable consumer would consider the presence or potential presence of dangerous substances like heavy metals important information and contrary to both the Products' advertising and Defendant's affirmative statements regarding its rigorous testing and quality-control.

75.     Indeed, had Defendant not affirmatively stated that it "test[s] products to identify heavy metal levels and to measure them against the recommended intake levels," reasonable consumers might not have purchased the Products (or would have paid much less for the Products).

76.      Likewise, had the existence (or potential risk) of the high levels of heavy metals been disclosed by Defendant, reasonable consumers would not have purchased the Products (or would have paid much less for the Products).

---

[72] Test Methodology: Heavy Metals in Protein Supplements, *Consumer Reports* at 3, https://article.images.consumerreports.org/image/upload/v1761140939/prod/content/dam/CRO-Images-2025/Special%20Projects/Consumer-Reports-Protein-Powders-and-Shakes-Contain-High-Levels-of-Lead-Methodology-Test-Results-v2.pdf, (last accessed Nov. 23, 2025).
[73] *Id*. at 4.
[74] *Id*. at 3-4.

77.    Further, had the presence or potential presence of dangerous substances at significant and unsafe levels been disclosed by Defendant, reasonable consumers would not have purchased the Products (or would have paid much less for the Products).

78.    Instead, Defendant affirmatively assured its consumers that the Products did not contain toxic substances at significant and unsafe levels and, conversely, were safe for daily human consumption.

79.    When faced with two product options in a store, one that does not contain or risk containing significant levels of toxic heavy metals, and another that contains or risks containing significant levels of toxic heavy metals, reasonable consumers would avoid the latter. This is because consumers value high-quality products that do not contain or risk containing detectable and significant levels of toxicants. Additionally, the presence of lead and other heavy metals brings into question the Products' supposed competitive advantage: premium protein in a nutritionally complete product without undesirable qualities, which consumers can use to maintain and improve health. Because the Products were – and continue to be – misrepresented and deceptively advertised, reasonable consumers are deprived of making an informed choice.

80.    The above deception is particularly material in the context of the Products, which are intended to be used regularly, if not daily, often replacing a consumer's entire meal.

81.    Exposure to heavy metals should be avoided and minimized. So, the presence of heavy metals at detectable and significant levels in the Products is important information to consumers.

82.    Based on Defendant's affirmative statements regarding its safety and quality-control testing, coupled with the Products' packaging and advertising, reasonable consumers did

not expect that the Products contained or risked containing detectable and significant levels of toxic heavy metals.

### G. Defendant's Duty to Disclose

83.    Defendant knew or should have known that it owed its consumers a duty of care to adequately test for the presence of toxic heavy metals in the Products and disclose the results of such testing if it showed the presence of toxic heavy metals, all of which it failed to do.

84.    Defendant was obligated to disclose that the Products contained or risked containing detectable and significant levels of lead and cadmium because it affirmatively told its consumers that it tested for this exact concern.[75]

85.    As such, Defendant had a duty to disclose that consumption of the Products could likely expose consumers to high levels of the toxic heavy metals.

86.    Had Defendant disclosed that the Products contain or risk containing detectable or significant levels of heavy metals, consumers would have been aware of it and would have made informed purchasing decisions.

87.    At a minimum, Defendant should not have confidently stated that its products were properly tested for the presence of lead and cadmium and should not continue to maintain that the Products' heavy metal levels are "well below the limits set by health authorities" that "pose[d] no risk to consumers."[76]

---

[75]    https://web.archive.org/web/20240420235048/https://huel.com/pages/huel-food-safety-and-quality-controls (last accessed Dec. 4, 2025); *see also* a version of the webpage from September 28, 2023, https://web.archive.org/web/20230928085010/https://huel.com/pages/huel-food-safety-and-quality-controls (same).
[76] https://huel.com/pages/food-safety-and-quality-controls (last accessed Dec. 4, 2025).

88.     Defendant has superior knowledge of its own Products. Defendant is experienced in the design, manufacture, and testing of protein supplements such as the Products.

89.     Defendant is aware of the raw inputs used to manufacture the Products, as it "visit[s] our suppliers so that we can understand where our ingredients come from as part of our procurement procedure."[77] Defendant also tests its products, specifically to "identify heavy metal levels and to measure them against the recommended intake levels."[78]

90.      Alternatively, before purchasing the Products, consumers had no reasonable way to know the Products contained detectable or significant levels of heavy metals. Consumers also had no way to know the Products posed a health risk when consumed regularly based on the cumulative amounts of heavy metals ingested.

91.     Defendant knew or should have known that it should not have sold batches of the Products that contained significant levels of lead and cadmium, batches that Consumer Reports purchased and tested.

92.     Defendant also knew or should have known it could control the levels of toxic heavy metals in the Products by properly monitoring the ingredients for toxic heavy metals and adjusting any manufacturing practices to reduce or eliminate the high levels of toxic heavy metals.

93.     It is reasonable to assert that Defendant knew or should have known it could control the levels of toxic heavy metals in its Products because, as explained above, there are

---

[77]    https://web.archive.org/web/20240420235048/https://huel.com/pages/huel-food-safety-and-quality-controls (last accessed Dec. 4, 2025); *see also* a version of the webpage from September 28, 2023, https://web.archive.org/web/20230928085010/https://huel.com/pages/huel-food-safety-and-quality-controls (same).

[78] *Id*.

other protein powder manufacturers who have been able to produce their products and ready-to-drink protein shakes with no, or significantly less, lead and cadmium.

94.     Prior to purchasing the Products, Plaintiffs and the Class Members were exposed to, saw, read, and understood Defendant's statements regarding its testing procedures, the Products' labels and advertisements, and relied upon them in purchasing the Products.

95.     Defendant knew or should have known that its consumers would read and rely on its statements, but still affirmatively lauded its safety and quality control processes and failed to disclose the presence (or risk) of high levels of lead and cadmium.

96.     As a result of Defendant's affirmative misrepresentations regarding its safety testing and quality control processes, and its active concealment of the fact that the Products contained significant levels of lead and cadmium, Plaintiffs and the Class members reasonably believed that Defendant's Products were free from substances that would negatively affect their health.

97.     Defendant knows that reasonable consumers would find the presence or material risk of heavy metals and other toxins in premium protein powder supplements material and that, had Plaintiffs and the Class members known the truth—i.e., that the Products contained (or risked containing) high levels of lead and cadmium, rendering them unsafe for regular consumption—they would not have been willing to purchase them or would have paid significantly less for them.

### H.    The Experiences of Plaintiffs Leonard, Lyons, Mackwood, Mauesby, and Pietras
####  Plaintiff Scott Leonard

98.    Plaintiff Scott Leonard has purchased and used Defendant's products since at least 2018, primarily consuming the Huel Black Edition powder and Defendant's Ready-to-Drink products as meal replacements.

99.    On or about July 22, 2018, On or about July 22, 2018, Plaintiff Leonard purchased one order of the Products—then marketed as "Huel Gluten-Free"—for $74, plus a $9 flavor boost. After that initial purchase, Plaintiff Leonard placed additional orders from time to time, including repeat purchases of the Huel Black Edition powder and Ready-to-Drink Products, typically reordering when his supply ran low.

100.    Plaintiff Leonard estimates that over the years, he has spent over $200 on the Products.

101.    At one point in or around 2018, Plaintiff Leonard maintained a diet consisting primarily of Defendant's Products for several weeks, during which he replaced all meals with the Products.

**Plaintiff Julian Lyons**

102.    Plaintiff Lyons has been using the Products for nearly four years now. He purchased Huel Black via Defendant's website, Huel.com, where he has maintained an account.

103.    On or about February 5, 2022, Plaintiff Lyons first paid for a one-time Bestseller Bundle for $105.56. Since then, Plaintiff Lyons regularly purchased "3 Black Edition," containing three bags of the Products with 10 meals each, at a cost varying between $118 and $129.14.

104.     While he was using Huel Black, Plaintiff Lyons consumed the product as a meal replacement every two to three days.

**Plaintiff Matthew Mackwood**

105.     Plaintiff Mackwood has been using the powder Product consistently for 2 years.

106.     On or about January 24, 2023, Plaintiff Mackwood first paid for the powder Products. Since then, Plaintiff Mackwood has received the Product approximately eleven times.

107.     During this time, Plaintiff Mackwood used the Products as a meal replacement and typically consumed it two to three mornings per week beginning in 2023, with decreasing use beginning in 2024.

**Plaintiff Miles Mauesby**

108.     Plaintiff Miles Mauesby has been using the Products for four years.

109.     On or about March 8, 2023, Plaintiff Mauesby paid for the Huel Black powder for a total of $42.50. Since then, Plaintiff Mauesby has received the powder Product at least five times, through October 2025. Four of these orders were the Bestseller Bundle for a total of $110 each, and Plaintiff Mauesby's final order involved two orders of the powder Product for a total of $92.70.

110.     During this time, Plaintiff Mauesby used the Products as a meal replacement and typically consumed at least one Huel drink per day.

**Plaintiff Robert Pietras**

111.     Plaintiff Pietras has been using the Products daily for several years.

112.     On or about January 30, 2025, Plaintiff Pietras first paid for an order containing the Huel Black protein powder and the Huel Powder v3.0, totaling $114.75. Since then, Plaintiff

Pietras received a new order of just the powder Product every month, through October 2025, for a total of $90 per month.

**I.      Plaintiffs the Class Suffered Actual and Impending Injuries Resulting from the Misrepresentations**

113.    Before purchasing the Products, all Plaintiffs had viewed various descriptions of Defendant's quality control and safety testing procedures, as well as the Products' beneficial attributes and absence of negative attributes, including, without limitation, statements made on Huel.com and on the Product's packaging.

114.    Plaintiffs understood the Huel brand to be offering only healthy and health-conscious products.

115.    Plaintiffs understood Defendant's statements, described in detail above, to mean that the Products (1) did not contain or risk containing concerning levels of lead and cadmium, (2) were free from significant levels of toxins like heavy metals, and (3) could not materially increase negative health risks associated with heavy metals exposure if consumed regularly.

116.    Plaintiffs each relied on Defendant's misrepresentations and omissions in deciding to purchase the Products.

117.    Plaintiffs would not have purchased the Products, or at a minimum would have paid less for them, had they known that the Products contained (or risked containing) significant or unsafe levels of heavy metals such as lead and cadmium.

118.    Plaintiffs would not have purchased the Products, or at a minimum would have paid less for them, had they known that the Products could materially increase the negative health risks associated with heavy metals exposure if consumed, particularly if consumed regularly.

119.    Plaintiffs would not have purchased the Products, or at a minimum would have paid less for them, had they known that the Products contained (or risked containing) heavy metals in excess of thresholds deemed safe by healthcare industry advocates.

120.    Because the Products were not accurately or truthfully advertised, and their quality control affirmatively misrepresented, each Product that Plaintiffs and Class Members purchased was worth less than the purchase price because it either contained or risked containing detectable, significant, and/or dangerous levels of heavy metals.

121.    Accordingly, Plaintiffs were injured and lost money as a result of Defendant's deceptive and unfair conduct.

## **CLASS ACTION ALLEGATIONS**

122.    Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following nationwide class (the "Class") and subclasses:

The Nationwide Class

> **All persons who purchased one or more of the Products in any state in the United States during the Class Period (with each person as a "Class Member").**

The California Subclass

> **All persons who purchased one or more of the Products in California during the Class Period (with each person as a "California Subclass Member").**

The Connecticut Subclass

> **All persons who purchased one or more of the Products in Connecticut during the Class Period (with each person as a "Connecticut Subclass Member").**

The Florida Subclass

> **All persons who purchased one or more of the Products in Florida during the Class Period (with each person as a "Florida Subclass Member").**

The New Hampshire Subclass

**All persons who purchased one or more of the Products in New Hampshire during the Class Period (with each person as a "New Hampshire Subclass Member").**

123.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, discovery, concealment, and accrual issues through the present.[79]

124.    Excluded from the Class are any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

125.    Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

126.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

127.    ***Numerosity Under Rule 23(a)(1).*** The Class and Subclasses are so numerous that the individual joinder of all members is impracticable, and the disposition of the claims of all

---

[79] The Class Period begins at minimum 3 years from the date of filing of this action, but based on tolling, may extend prior to that date.

members of the Class and Subclasses in a single action will provide substantial benefits to the parties and the Court. Although the precise number of members of the Class is unknown to Plaintiffs at this time, on information and belief, the proposed Class and Subclasses are estimated to contain many thousands of individuals. Discovery will reveal, through Defendant's records, the actual number of members of the Class and Subclasses.

128.    ***Commonality Under Rule 23(a)(2).*** Common legal and factual questions exist that predominate over any questions affecting only individual members of the Class and Subclasses. These common questions, which do not vary among members of the Class and Subclasses, and which may be determined without reference to any Class and/or Subclasses member's individual circumstances, include, but are not limited to:

(a)    Whether the Defendant manufactured, distributed, advertised, marketed, and/or sold the Products.

(b)    Whether the Products contain or risk containing detectable and significant levels of lead or cadmium.

(c)    Whether the Products contain or risk containing unsafe levels of lead or cadmium.

(d)    Whether the levels of lead or cadmium in the Products can increase the negative health risks associated with ingesting heavy metals.

(e)    Whether Defendant knew or should have known the Products contained or risked containing significant or unsafe levels of lead or cadmium.

(f)    Whether a reasonable consumer would consider the presence of the heavy metals in the Products to be material.

(g)    Whether Defendant misrepresented the Products to be of a particular standard or quality.

(h)     Whether Defendant intentionally or recklessly misrepresented the Products to be of a particular standard or quality.

(i)     Whether Defendant intended not to sell, manufacture, or distribute the Products as advertised and labeled.

(j)     Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products were and are deceptive.

(k)     Whether Defendant intentionally or recklessly omitted and/or failed to disclose material facts regarding the Products.

(l)     Whether Defendant concealed that the Products contain or risk containing the significant and unsafe levels of heavy metals described herein.

(m)     Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein, such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs, the Class, and the Subclasses.

(n)     Whether Plaintiffs and the Class and Subclasses Members are entitled to damages, restitution, and/or disgorgement from Defendant.

(o)     Whether injunctive relief is appropriate and necessary to enjoin Defendant from continuing to supply the Products as manufactured and advertised.

(p)     Whether Plaintiffs and the Class and Subclasses Members have been damaged by the wrongs alleged and are entitled to actual, statutory, or other forms of damages and other monetary relief; and

(q)     Whether Plaintiffs and the Class and Subclasses Members are entitled to injunctive or equitable relief, including restitution.

129. ***Predominance:*** The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes.

130. ***Typicality Under Rule 23(a)(3).*** Plaintiffs' claims are typical of those of other members of the Class and Subclasses, all of whom have suffered similar harm due to Defendant's course of conduct as described herein. Defendant's uniformly unlawful course of conduct injured Plaintiffs and Class and Subclasses Members in the same way, through the same wrongful acts and practices. Likewise, Plaintiffs and other Class and Subclasses Members must prove the same facts in order to establish the same claims.

131. ***Adequacy of Representation Under Rule 23(a)(4).*** Plaintiffs are adequate representatives of the Class and Subclasses because their interests do not conflict with the interests of the Class and Subclasses. Plaintiffs have retained counsel competent and experienced in complex litigation, false advertising cases, and consumer protection class action matters such as this one, and Plaintiffs and their counsel intend to vigorously prosecute this action for the Class and Subclasses' benefit and have the resources to do so. Plaintiffs and their counsel have no interests adverse to those of the other members of the Class and Subclasses.

132. ***Superiority.*** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because individual litigation of each Class and Subclasses Member's claim is impracticable. The damages, harm, and losses suffered by the individual members of the Class and Subclasses will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's wrongful conduct. Even if each Class and Subclass Member could afford individual litigation, the Court system could not. It would be unduly burdensome if tens of thousands of individual cases or more proceeded. Individual litigation also presents the potential for inconsistent or contradictory judgments, the

prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those individuals with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the Courts because it requires individual resolution of common legal and factual questions. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

133.    Finally, all members of the proposed Class and Subclasses are readily ascertainable. Defendant and/or third-party retailers should have records reflecting the names of the consumers who purchased the Products during the Class Period.

134.    As a result of the foregoing, class treatment under Federal Rule of Civil Procedure 23 is appropriate.

## TOLLING OF THE STATUTE OF LIMITATIONS AND DELAYED DISCOVERY

135.    All applicable statutes of limitations have been tolled by the delayed discovery doctrine and the doctrine of fraudulent concealment.

136.    Plaintiffs and Class and Subclass Members could not have reasonably discovered Defendant's practice of introducing Products latent with toxic substances at significant and unsafe levels into the marketplace, at any time prior to commencing this class action litigation.

137.    A reasonable consumer purchasing Defendant's Products would simply believe that the Products are free of detectable, significant, and unsafe levels of heavy metals linked to cancers and diseases, particularly given Defendant's misleading website statements, packaging, and advertising as described herein. Nothing in Defendant's website statements, marketing, or advertising of the Products would lead a reasonable consumer to suspect the existence or potential existence of carcinogenic or highly toxic ingredients, let alone at significant and dangerous levels.

138.    No reasonable consumer could have independently discovered that Defendant's Products are latent with toxins, including at dangerous levels. Like Plaintiffs, the reasonable consumer does not have access to sophisticated scientific resources, nor is the reasonable consumer trained to test the Products for toxins and evaluate their comparative safety. Relying on Defendant's representations of its safety testing and quality control procedures, as well as the quality and characteristics of the Products as safe for ordinary use, neither Plaintiffs nor any reasonable consumer knew such scientific testing was needed.

139.    Plaintiffs did not learn of the presence or potential presence of heavy metals as alleged herein until shortly before commencing this action.

140.    Further, Defendant knew or should have known that the Products contained or risked containing high levels of toxic heavy metals. This is particularly true given Defendant's claims of third-party testing and quality control procedures, as detailed above.

141.    Despite the issue with its Products during the Class Period, Defendant concealed and omitted the potential risks associated with consuming its Products. Instead, Defendant continued to manufacture the same formulas and market the Products as wholly safe and healthy for consumers' consumption.

142.    Plaintiffs and Class Members had no feasible means of knowing or learning of the potential risks associated with consuming the Products. Had they known, they would not have purchased the Products, or, at a minimum, would have paid a much lower price. Plaintiffs and the Class Members reasonably relied on the misrepresentations and cherry-picked facts that Defendant chose to reveal about the Products on its website, in its advertisements, and on the Products' packaging.

143.    As a result, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**<u>FIRST CAUSE OF ACTION</u>**
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**FLA. STAT §§ 501.201, *et seq*.**
***(On Behalf of Plaintiff Lyons, Plaintiff Pietras, and the Florida Subclass)***

144.    Plaintiffs Lyons and Pietras incorporate all preceding factual allegations as if fully set forth herein.

145.    Plaintiffs Lyons and Pietras bring this claim on behalf of themselves and the Florida Subclass.

146.    The purpose of FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

147.    At all times relevant herein, Defendant solicited, advertised, offered, provided, and distributed goods in the State of Florida, was engaged in trade or commerce pursuant to Fla. Stat. § 501.203(8), and is therefore subject to the provisions contained in the FDUTPA.

148.    Plaintiff Lyons, Plaintiff Pietras, and the members of the Florida Subclass are "consumer[s]" as defined by §501.203(7), Florida Statutes, and as such are entitled to the protection of FDUTPA.

149.    Pursuant to Fla. Stat. § 501.204(1), FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

150.    In marketing and selling the Products in Florida, Defendant was required to be honest in its dealings and not engage in any actions that had the effect of deceiving purchasers of the Products.

151.    Defendant engaged in unfair and deceptive acts in violation of FDUTPA, by making materially misleading statements and omissions regarding the health and safety of the Products, which prevented Plaintiff Lyons, Plaintiff Pietras, and the Florida Subclass from learning that Defendant's Products contained dangerous levels of heavy metals, such as lead and cadmium.

152.    Defendant's affirmative acts and omissions caused Plaintiff Lyons, Plaintiff Pietras, and the Florida Subclass to reasonably believe that they were purchasing for consumption a product that was healthy and safe. Plaintiff Lyons, Plaintiff Pietras, and the Florida Subclass reasonably relied on Defendant's material representations and omissions when purchasing the Products. Defendant failed to disclose or intentionally concealed the presence or risk of harmful contaminants in the Products, including lead and cadmium, which would have been a material consideration of Plaintiff Lyons, Plaintiff Pietras, and the Florida Subclass's purchasing decisions.

153.    Defendant's deceptive acts and omissions deprived Plaintiff Lyons, Plaintiff Pietras, and the Florida Subclass of the benefit of their bargain.

154.    Plaintiff Lyons, Plaintiff Pietras, and the Florida Subclass have been aggrieved by Defendant's misleading statements about and advertising of the Products. By misrepresenting the safety standards of its manufacturing and failing to disclose or intentionally concealing the presence or risk of heavy metals in the Products, Defendant caused Plaintiffs Lyons and Pietras and the Florida Subclass to pay a premium for a purportedly safe and nutritious product.

155.    Defendant knew or should have known that its material representations and omissions regarding the safety of the Products were false or misleading, yet caused such

representations to be promoted and distributed throughout Florida and nationwide through advertising, marketing, and other promotional channels.

156.    As a result of Defendants' violations of FDUTPA, Plaintiff Lyons, Plaintiff Pietras, and the members of the Florida Subclass have suffered a substantial injury and have been aggrieved and are, thus, entitled to damages under FDUTPA.

157.    Plaintiffs Lyons and Pietras would not have purchased, and at a minimum would not have paid the same price for, Defendant's Products had Defendant disclosed the risk and/or presence of dangerous contaminants in its Products.

158.    As redress for Defendant's repeated violations of FDUTPA, Plaintiff Lyons, Plaintiff Pietras, and the members of the Florida Subclass are entitled to, *inter alia*, damages and declaratory and/or injunctive relief and reasonable attorney's fees and costs.

<u>SECOND CAUSE OF ACTION</u>
**Violation of the Connecticut Unfair Trade Practices Act ("CUTPA")**
**CT Gen Stat § 42-110b, *et seq*.**
***(On Behalf of Plaintiff Mauesby and the Connecticut Subclass)***

159.    Plaintiff Mauesby incorporates all preceding factual allegations as if fully set forth herein.

160.    Plaintiff Mauesby brings this claim against Defendant on behalf of himself and the Connecticut Subclass.

161.    Pursuant to CT Gen Stat § 42-110b, it is unlawful to "engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

162.    Plaintiff Mauesby and the Connecticut Subclass have standing to pursue this claim because Plaintiff Mauesby and members of the Connecticut Subclass have suffered injury in fact and have lost money as a result of Defendant's actions set forth above.

163.    Pursuant to CT Gen Stat § 42-110a, "[t]rade" and "commerce" means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.

164.    Defendant is a "person" as defined by CT Gen Stat § 42-110a, and as such is subject to the provisions of the NHCPA.

165.    Defendant violated the CUPTA by advertising the Products in an "unfair or deceptive" manner, representing that the Products were safe and healthy for human consumption while failing to disclose the risk or presence of heavy metal contaminants.

166.    Defendant engaged in "unfair or deceptive acts or practices" by deceiving Plaintiff Mauesby and the Connecticut Subclass through representations that the Products were tested for safety and quality control, while failing to disclose the risk or presence of toxic heavy metal contaminants.

167.    Plaintiff Mauesby and the Connecticut Subclass paid a price for the Product that they would not have otherwise paid had they been fully informed about the presence or risk of dangerous lead and cadmium exposure. Additionally, Plaintiff Mauesby and the Connecticut Subclass would not have purchased Defendant's Product had they been informed about the presence or risk of heavy metals exposure.

168.    As a result of Defendant's unfair and deceptive conduct, Plaintiff Mauesby and the Connecticut Subclass seek an Order from this Court enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices pursuant to CT Gen Stat § 42-110g(d). Defendant's misleading statements and marketing is ongoing and will continue to harm the public absent a permanent public injunction.

169.    Plaintiff Mauesby further seeks all other relief allowable pursuant to CT Gen Stat § 42-110g., including an order for the restitution of all monies that were unjustly acquired from the sale of the Product to Plaintiff Mauesby and the Connecticut Subclass through its unfair methods of competition and unfair or deceptive acts or practices.

170.    Plaintiff Mauesby additionally seeks an award of attorneys' fees and costs.

### THIRD CAUSE OF ACTION
**Violation of the New Hampshire Consumer Protection Act ("NHCPA")**
**NH Rev Stat § 358-A** *et seq.*
***(On Behalf of Plaintiff Mackwood and the New Hampshire Subclass)***

171.    Plaintiff Mackwood incorporates all preceding factual allegations as if fully set forth herein.

172.    Plaintiff Mackwood brings this claim against Defendant on behalf of himself and the New Hampshire Subclass.

173.    Pursuant to NH Rev Stat § 358-A:2, it is unlawful "for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."

174.    Plaintiff Mackwood and the New Hampshire Subclass have standing to pursue this claim because Plaintiff Mackwood and members of the New Hampshire Subclass have suffered injury in fact and have lost money as a result of Defendant's actions set forth above.

175.    Pursuant to NH Rev Stat § 358-A:1, "[t]rade" and "commerce" will "include the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state."

176.    Defendant is a "person" as defined by NH Rev Stat § 358-A:1, and as such is subject to the provisions of the NHCPA.

177.    Defendant violated the NHCPA by advertising the Products in an "unfair or deceptive" manner, representing that they were safe and healthy while failing to disclose the risk or presence of heavy metal contaminants.

178.    In that regard, Defendant violated the NHCPA specifically by "[r]epresenting that [the Products were] of a particular standard, quality, or grade...[when] they are of another."

179.    Defendant engaged in an "unfair or deceptive act or practice" by deceiving Plaintiff Mackwood and the New Hampshire Subclass through representations that the product is safe and healthy while failing to disclose the risk or presence of toxic heavy metal contaminants.

180.    Plaintiff Mackwood and the New Hampshire Subclass paid a price for the Product that they would not have otherwise paid had they been fully informed about the presence or risk of dangerous toxicant exposure. Additionally, Plaintiff Mackwood and the New Hampshire Subclass would not have purchased Defendant's Product had they been informed about the presence or risk of heavy metals exposure.

181.    As a result of Defendant's unfair and deceptive conduct, Plaintiff Mackwood and the New Hampshire Subclass seek an Order from this Court enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices pursuant to NH Rev Stat § 358-A:10. Defendant's misleading marketing is ongoing and will continue to harm the public absent a permanent public injunction.

182.    Plaintiff Mackwood further seeks all other relief allowable pursuant to NH Rev Stat § 358-A:10, including an order for the recovery of all monies that were unjustly acquired from the

sale of the Products to Plaintiff Mackwood and the New Hampshire Subclass through its unfair methods of competition and unfair or deceptive acts or practices.

183.    Plaintiff Mackwood additionally seeks an award of attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law ("UCL")**
**California Business and Professional Code § 17200, *et seq.***
***(On Behalf of Plaintiff Leonard and the California Subclass)***

184.    Plaintiff Leonard incorporates all preceding factual allegations as if fully set forth herein.

185.    Plaintiff Leonard brings this claim against Defendant on behalf of himself and the California Subclass.

186.    California's Unfair Competition Law ("UCL") prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*]."

187.    Plaintiff Leonard and the California Subclass have standing to pursue this claim because Plaintiff Leonard and members of the California Subclass have suffered injury in fact and have lost money as a result of Defendant's actions set forth above.

188.    Defendant's conduct was unfair because it deceived its customers and the public into thinking that they were purchasing a product that was healthy and safe for regular human consumption.

189.    Defendant's actions and conduct as alleged herein constitute an "unfair" practice within the definition, meaning, and construction of California's UCL because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to their customers. The harm caused by Defendant's wrongful conduct

outweighs any utility of such conduct and has caused – will continue to cause – substantial injury to Plaintiff Leonard and the California Subclass. Additionally, Defendant's conduct is "unfair" because it violated the legislatively declared policies in California's False Advertising Law (Bus. & Prof. Code §§ 17500, *et seq*.) and the CLRA (Civ. Code §§ 1750, *et seq*.).

190.    Defendant's actions as alleged herein constitute a "fraudulent" practice within the definition, meaning, and construction of California's UCL because Defendants' misrepresentations that the Products were tested for safety and quality control, while failing to disclose the risk or presence of heavy metal contaminants during the Class Period, were false and likely to deceive the public.

191.    As a result of Defendant's "unlawful," "fraudulent," and "unfair" conduct, Plaintiff Leonard and members of the California Subclass paid more for the Products during the Class Period than they otherwise would have had they been informed of the presence or risk of toxic heavy metal contaminants, and Plaintiff Leonard and members of the California Subclass did not obtain the complete characteristics and specifications of the Products promised by Defendant.

192.    Defendant's conduct directly and proximately caused Plaintiff Leonard and the California Subclass actual monetary damages in the form of the price paid for the Products during the Class Period. The injuries, damages, and harm caused to Plaintiff Leonard and the California Subclass by Defendant's unfair conduct are not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided. Defendant knew or had reason to know Plaintiff Leonard and the California Subclass could not have reasonably known or discovered that the Products advertised and sold during the Class Period contained or risked containing high levels of lead and cadmium. Had Defendant

disclosed this risk, Plaintiff Leonard and the California Subclass would not have purchased the Products during the Class Period.

193.     Plaintiff Leonard and the California Subclass relied on Defendant's unfair, deceptive, untrue, and misleading representations regarding the product's healthiness and safety to their detriment.

194.     Defendant's wrongful business practices alleged herein constitute a continuing course of unfair competition because Defendant markets and sells its products in a manner that offends public policy and/or in a fashion that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to its customers. In accordance with California Business & Professions Code § 17203, Plaintiff Leonard and the California Subclass seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices. Defendant's misleading statements and marketing are ongoing and will continue to harm the public absent a permanent public injunction.

195.     Plaintiff Leonard and the California Subclass also seek an order requiring Defendant to make full restitution of all moneys it has wrongfully obtained from Plaintiff Leonard and the California Subclass, along with all other relief permitted under the UCL.

196.     Plaintiff Leonard additionally seeks an award of attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
**Violation of the California False Advertising Law (FAL)**
**California Business and Professional Code § 17500, *et seq.***
***(On Behalf of Plaintiff Leonard and the California Subclass)***

197.     Plaintiff Leonard incorporates all preceding factual allegations as if fully set forth herein.

198.     Plaintiff Leonard brings this claim against Defendant on behalf of himself and the California Subclass.

199.    The FAL prohibits the dissemination of untrue or misleading information that is known, or through the exercise of reasonable care should be known, to be false or misleading. It also prohibits advertising products with the intent not to sell them as advertised.

200.    Plaintiff Leonard, individually and on behalf of the California Subclass, has standing to pursue this claim because he suffered injury in fact and lost money or property as a result of Defendant's actions set forth above.

201.    Defendant engaged in advertising and marketing to the public and offered for sale the Products in California during the Class Period.

202.    Defendant engaged in the advertising and marketing alleged herein with the intent to directly or indirectly induce the sale of the Products to consumers such as Plaintiff Leonard and members of the California Subclass.

203.    Defendant's advertising and marketing representations regarding the Products during the Class Period were false, misleading, and deceptive within the definition, meaning, and construction of California Business & Professions Code §§ 17500, *et seq*. (False Advertising Law).

204.    Defendant's misrepresentations and omissions alleged herein were the type of misrepresentations that are material, *i.e.*, a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

205.    Defendant's misrepresentations and omissions alleged herein are objectively material to a reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

206.    Defendant's deceptive conduct directly and proximately caused Plaintiff Leonard and the California Subclass to suffer an ascertainable loss. Plaintiff Leonard and the Subclass would not have purchased, and at a minimum would not have paid the same price for, Defendant's

Products had Defendant disclosed the risk and/or presence of dangerous contaminants in its Products.

207.    At the time they made the misrepresentations and omissions alleged herein, Defendant knew or should have known that they were untrue or misleading and acted in violation of California Business & Professions Code §§ 17500, *et seq*.

208.    As a result of Defendant's conduct and actions, Plaintiff Leonard and each member of the California Subclass have been injured, have lost money or property, and are entitled to relief. Plaintiff Leonard and the California Subclass seek disgorgement, restitution, injunctive relief, and all other relief permitted under California Business & Professions Code §§ 17500, *et seq*.

209.    Additionally, Plaintiff Leonard seeks an award of attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### Violation of the California Consumer Legal Remedies Act (CLRA)
### California Civil Code § 1750, *et seq*.
### *(On Behalf of Plaintiff Leonard and the California Subclass)*

210.    Plaintiff Leonard incorporates all preceding factual allegations as if fully set forth herein.

211.    Plaintiff Leonard brings this claim against Defendant on behalf of himself and the California Subclass.

212.    Plaintiff Leonard and members of the California Subclass are "consumers" within the meaning of Cal. Civ. Code § 1761(d), and their purchases of Defendant's Products constitute a "transaction" within the meaning of Cal. Civ. Code § 1761(e). Defendant's Product is a "good" within the meaning of Cal. Civ. Code § 1761(a). Defendant is a "person" as that term is defined in California Civil Code section 1761(c).

213.    Defendant's deceptive advertising and statements that its Products were tested for safety and quality control, while failing to disclose the risk or presence of dangerous heavy metals,

constitute business practices that violate the CLRA. More specifically, Defendant has violated Cal. Civ. Code § 1770(a) by, *inter alia*:

    a.   Representing that the Products have characteristics, benefits, or uses that they do not have (Cal. Civ. Code § 1770(a)(5));

    b.   Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770 (a)(16)); and

    c.   Advertising the Products without the intent to sell them as advertised (Cal. Civ. Code § 1770(a)(7)).

214.    Defendant falsely represented and advertised that the Products marketed and sold during the Class Period were safe and healthy for human consumption, even daily consumption.

215.    Defendant misled consumers by continuing to falsely represent the safety and quality of the Products to consumers, such as Plaintiff Leonard and the California Subclass, despite knowing – or, at a minimum, having should have known – that the Products contained or risked containing significant levels of toxic heavy metals. Defendant owed a duty to disclose this risk in order to make its continued marketing of the Products not misleading.

216.    In addition, under California law, a duty to disclose arises in several circumstances, including: (1) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (2) when the defendant actively conceals a material fact from the plaintiff; and (3) when the defendant makes partial representations but also suppresses some material facts.

217.    Defendant had a duty to disclose to Plaintiff Leonard and the California Subclass that the Products sold during the Class Period contained, or risked containing, significant levels of toxic heavy metals, because: (1) Defendant had exclusive knowledge of the information at the time

of marketing and sale; (2) Defendant actively concealed the information from Plaintiff Leonard the California Subclass; and (3) Defendant made numerous representations to Plaintiff Leonard the California Subclass regarding the safety and quality testing of the Products it marketed and sold during the Class Period.

218.    Defendant's misrepresentations and omissions alleged herein were likely to mislead an ordinary consumer. Plaintiff Leonard and members of the California Subclass reasonably understood Defendant's representations and omissions to mean that the Products sold during the Class Period were safe for human consumption.

219.    Defendant's misrepresentations and omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

220.    Plaintiff Leonard and members of the California Subclass relied upon Defendant's marketing of the Products and were misled into believing that they were wholly safe for human consumption. Plaintiff Leonard and members of the California Subclass relied to their detriment on Defendant's misrepresentations and omissions in purchasing the Products during the Class Period.

221.    Defendant's violations of the CLRA directly and proximately caused Plaintiff Leonard and the California Subclass to suffer an ascertainable loss. Plaintiff Leonard and the Subclass would not have purchased, and at a minimum would not have paid the same price for, Defendant's Products had Defendant disclosed the risk and/or presence of dangerous contaminants in its Products.

222.    As a result of Defendant's materially misleading conduct, Plaintiff Leonard and the California Subclass seek an Order enjoining Defendant from continuing to engage in such further

dissemination of false or misleading information regarding its Products. Aside from the economic harm this caused, the trust of the public in products that claim to be nutritious, healthy, and safe for everyday use is compromised. Defendant's conduct is ongoing and will continue to harm the public absent a permanent public injunction.

223.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

224.    Additionally, Plaintiff Leonard seeks an award of attorneys' fees and costs.

225.    Concurrent with the filing of this Complaint, Plaintiff Leonard will provide Defendant with notice pursuant to Cal. Civ. Code § 1782 and will, absent corrective action, amend this Complaint to seek actual damages.

**SEVENTH CAUSE OF ACTION**
**Unjust Enrichment / Quasi-Contract**
*(On Behalf of Plaintiffs and the Nationwide Class)*

226.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

227.    Plaintiffs bring this claim against Defendant on behalf of themselves and the Nationwide Class.

228.    Plaintiffs and the Class Members conferred a benefit on Defendant in the form of funds paid for the Products.

229.    Defendant knew or reasonably should have known that its Products contained or risked containing high levels of heavy metals. Defendant additionally knew that its affirmative representations regarding its safety testing procedures, coupled with its failure to disclose the presence or risk of exposure to the dangerous contaminants, all while advertising the product as safe and healthy, would materially mislead consumers in violation of the law.

230.    By taking and retaining possession and control of funds paid by Plaintiffs for the deceptively advertised Products, Defendant was enriched at Plaintiffs' expense. It is contrary to justice and good conscience to permit to Defendant to retain the funds Plaintiffs originally remitted for products containing dangerous contaminants that Defendant knowingly marketed as healthy and safe for daily consumption.

231.    Defendant nevertheless retained Plaintiffs' funds anyway and diverted them for its own purposes, unfairly without adequate justification.

232.    Plaintiffs and the Class Members are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

233.    Plaintiffs, the Class, and the public at large have suffered immediate and irreparable injury as a result of Defendant's conduct and will continue to do so absent an injunction issued by this Court.

234.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the Class Members have suffered various types of damages alleged herein.

235.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by them because of its misconduct described herein.

236.    As a result of Defendant's wrongful conduct, Plaintiffs and the Class Members seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other relief this Court deems just and proper.

### EIGHTH CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability**
*(On Behalf of Plaintiffs and the Nationwide Class)*

237.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

238.    Plaintiffs bring this claim against Defendant on behalf of themselves and the Nationwide Class.

239.    A warranty that Defendant's Products were merchantable and fit for the ordinary purposes for which such goods are used was implied by law into the sale of the Products.

240.    Defendant's Products, which Plaintiffs and the Class purchased, constitute goods.

241.    Defendant is a merchant with respect to goods of the kind at issue here.

242.    There was a sale of goods from Defendant to Plaintiffs and the Class Members.

243.    Defendant's express warranties and representations made regarding its Products became part of the basis of the bargain between Plaintiffs and the Class Members, which created an implied warranty that the Products would conform to those representations and descriptions.

244.    At the time the Products were sold, Defendant knew or should have known that Plaintiffs and members of the Class would rely on Defendant's skill and judgment regarding the safety and composition of the Products.

245.    The Products were not fit for their ordinary purpose (consumption by consumers) as they contained undisclosed and unsafe levels of heavy metals that do not conform to the statements made by Defendant regarding the Products or packaging of the Products, and are not of the same quality as those generally accepted in the trade.

246.    By failing to provide meal replacement Products that are free from unsafe levels of heavy metals like lead and cadmium, Defendant violated the implied warranty.

247.    Defendant's breach of the implied warranty directly and proximately caused Plaintiffs and the Class to suffer an ascertainable loss. Plaintiffs would not have purchased, and at a minimum would not have paid the same price for, Defendant's Products had Defendant disclosed the risk and/or presence of dangerous contaminants in its Products.

248.    As a result of Defendants' conduct, Plaintiffs and other Class Members suffered damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and Subclasses set forth herein, respectfully request that the Court order the following relief and enter judgment against Defendant as follows:

A.    Certifying this action as a class action under Federal Rule of Civil Procedure 23 and appointing Plaintiffs and their counsel to represent the Class and Subclasses;

B.    Declaring that Defendant engaged in the illegal and wrongful conduct alleged herein;

C.    Entering judgment for Plaintiffs and the Class and Subclasses;

D.    Granting permanent and appropriate injunctive relief to prohibit Defendant from continuing to engage in the unlawful or wrongful acts, omissions, and practices described herein and directing Defendant to adequately manufacture and accurately represent the Products;

E.    Awarding compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

F.    Awarding statutory or punitive damages and penalties as allowed by law in an amount to be determined at trial;

G.    Ordering disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

H.    Awarding to Plaintiffs and Class and Subclass Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

I.      Awarding pre- and post-judgment interest at the maximum legal rate and all such

other relief as it deems just and proper; and

J.      Granting such further and other relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all claims and issues so triable.

Dated: December 30, 2025          By:      */s/ Christian Levis*
                                          Christian Levis
                                          **LOWEY DANNENBERG, P.C.**
                                          44 South Broadway, Suite 1100
                                          White Plains, NY 10601
                                          Telephone: (914) 997-0500
                                          Facsimile: (914) 997-0035
                                          Email: clevis@lowey.com

                                          Anthony M. Christina (pro hac vice forthcoming)
                                          **LOWEY DANNENBERG, P.C.**
                                          One Tower Bridge
                                          100 Front Street, Suite 520
                                          West Conshohocken, PA 19428
                                          Telephone: (215) 399-4770
                                          Facsimile: (914) 997-0035
                                          Email: achristina@lowey.com

                                          Edward F. Haber (*pro hac vice* forthcoming)
                                          Ian J. McLoughlin (*pro hac vice* forthcoming)
                                          Emilie Castro-Schwarz (*pro hac vice* forthcoming)
                                          **SHAPIRO HABER & URMY LLP**
                                          One Boston Place, Suite 2600
                                          Boston, MA 02108
                                          Tel: (617) 439-3939
                                          Fax: (617) 439-0134
                                          ehaber@shulaw.com
                                          imcloughlin@shulaw.com
                                          ecastronschwarz@shulaw.com

                                          *Counsel for Plaintiffs*
                                          *and the Putative Classes*